**Herbert W. CABBLER**

v.

**SUPERINTENDENT, VIRGINIA STATE PENITENTIARY.**

Civ. A. No. 73–538–R.

United States District Court,
E. D. Virginia,
Richmond Division.
April 23, 1974.

JeRoyd W. Greene, Jr., Richmond, Va., for plaintiff.

Gilbert Haith, Asst. Atty. Gen. of Va., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, a Virginia prisoner, seeks habeas corpus relief from detention pursuant to his conviction of grand larceny in the Hustings Court for the City of Roanoke on February 21, 1970. As a result of that conviction petitioner was sentenced to serve a term of eleven years in the penitentiary. Jurisdiction is attained pursuant to 28 U.S.C. § 2254. State court remedies have been exhausted. The case is presently before the Court on respondent's motion to dismiss and for summary judgment. Memoranda have been received from both sides and the merits of the claims were to some extent addressed in the course of oral argument on an unsuccessful motion by petitioner for bond pending the outcome of his petition. Upon the material before it, the Court deems the matter ripe for disposition.

The following facts emerge from the petitioner's trial court transcript:

In the early morning of September 2, 1969 at approximately 1:20 a. m., Cabbler parked his Cadillac automobile on a driveway in front of the Community Hospital of Roanoke Valley and proceeded into the emergency room of the hospital (T. 38). There was some conflict in the evidence as to whether the Cadillac partially blocked the entrance to the emergency room driveway.

Cabbler testified that the car was parked in a fifteen minute zone (T. 149). The arresting officer stated the hospital regulations marked the place where the car was parked as a no parking zone (T. 65), and Cabbler's car partially blocked the emergency room driveway even though an ambulance could drive by to the emergency room (T. 82).

Cabbler was arrested inside of the hospital by a Roanoke City police sergeant, R. C. Reynolds, upon information he obtained on the telephone that a warrant was being issued against Cabbler for shooting into an occupied dwelling (T. 40 and 41). At the time of the arrest in the emergency room, Cabbler was searched and the keys to his automobile parked outside of the hospital were taken from him by Sergeant Reynolds (T. 55; T. 151; T. 153; T. 162; T. 213; and T. 254). Cabbler was taken from the hospital and placed in a police car (T. 41 and 42). It was beginning to rain and Cabbler asked one of the police officers to roll up the windows of his automobile (T. 42); but before the windows were rolled up, Cabbler was placed in the police car. When rolling up the windows and even beforehand, the police officers observed a pistol on the back seat of the car. This pistol was taken by the officers at the time but that search is not here involved. Cabbler was then taken by Sergeant Reynolds to police headquarters in the police car (T. 48).

Cabbler testified that he had thought he would be in the hospital all night because of a gunshot wound (T. 155; first answer) and that he had called his restaurant and asked the countergirl to send one of his employees to pick up his car (T. 150). He further testified that he attempted to tell the officer that someone would pick up his car (T. 156; T. 163, first answer). In any event, Cabbler did not give the police officers permission to remove the car (T. 206; second answer) or to look in the trunk of the car and keep the property therein for safe keeping (T. 206, third answer). Further, it is undisputed that the police officers did not suspect stolen goods were in the trunk of the automobile (T. 206; fifth answer). Nonetheless, after taking petitioner to the police station, Sergeant Reynolds returned to the hospital and drove Cabbler's car to the police station as well.

The evidence is that Sergeant Reynolds' retrieval of Cabbler's car was for the purpose of keeping the car safe until Cabbler was released from jail (T. 47 and 48; T. 67 and 68; T. 202; T. 206). The established police department policy was to remove all valuables from an automobile taken into custody and return them to the owner upon his release on bail (T. 210, fourth answer). The evidence further discloses that the arresting police officer would not have left the car locked and unattended even if he had known Cabbler had someone coming to the hospital to pick up the car (T. 77). Sergeant Reynolds testified that if he had arrested Cabbler and not taken Cabbler's car into custody, he would have been responsible for all the property in the car at that time (T. 73, first answer).

When Sergeant Reynolds drove the Cadillac to police headquarters, he planned to take any property from the car and put it in the No. 2 property room on the first floor of the Municipal Building (T. 49). When he opened the trunk of the car with the key found on Cabbler's person at the time of Cabbler's arrest, Sergeant Reynolds observed that the goods in the trunk were so numerous that the No. 2 property room would not hold them. He then drove the automobile to the Municipal Building Annex and moved the goods from the trunk of the car to a property room in the basement of that building (T. 50). Because this property room in the basement was locked and the key would not be available until the next morning, Sergeant Reynolds and Police Sergeant Allen, with the possible assistance of other police officers, placed the property taken from Cabbler's car on a pool table in the basement of the building. Then they began to inventory the goods in preparation of putting them in the property room after it became accessible the next morning (T. 50 and 51). The purpose of taking the property from the locked trunk of the car was to keep it safely until Cabbler was released on bail (T. 50, last answer). Cabbler was released on bail and picked up his car within an hour or two after being arrested (T. 51, last answer; T. 257, second answer) and long before the property taken from the trunk of his car for safe keeping was removed from the pool table to a safe property room.

The evidence was that it has been the long-standing custom of the Roanoke City Police Department to take into its possession the automobile of a person arrested and to remove from the automobile and inventory the valuable goods found therein. Apparently it is not necessary that the person arrested be in his automobile at the time of his arrest; it is only necessary that he be away from home. If a man is arrested for illegal parking, his car is not taken or his property inventoried (T. 58, lines fifteen and sixteen). If he is arrested at his home, his car is not taken (T. 58). It was conceded that there was no written process to seize the car, no search warrant obtained at any time (T. 199) and no probable cause to believe stolen property was in the locked trunk of the car (T. 69) and no process to keep the property after the car was returned to Cabbler (T. 7). It is conceded by both sides

that the officers in this case did not intend to search the trunk for evidence or stolen property, but to take any property therein for "safekeeping."

It was adequately proved that some of the property found in the locked trunk of Cabbler's car on September 2, 1969 was stolen property. Cabbler was convicted on five larceny charges as one who received stolen goods knowing them to have been stolen. He argues that the evidence seized in the trunk should have been suppressed.

Three legal questions are presented by the facts: (1) was seizure of the car justified; (2) did a Fourth Amendment search follow; and (3) if so, was that search reasonable.

■ Initially, the Court must decide whether the car itself was legally removed to the police station. The Court has no difficulty in concluding that when a legitimate arrest of a suspect is made away from his home, seizure not only of his person, but of those of his effects which are with him is justified. Given the exigencies of the typical street arrest, officers are not required to take time out from their immediate purpose to allow their suspect to put his affairs in order. Since it would be anomalous to find that the Fourth Amendment, designed to insure the sanctity of private possessions, *compelled* the police to leave the personal effects of a prisoner, be they suitcases, cars or other items, scattered in the street, the assumption of temporary possession by officers cannot be found unreasonable under its dictates.[1] See Cady v. Dombrowski, 413 U.S. 433,

446–447, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

The second question is whether the "inventory" conducted under the facts of the instant case is a Fourth Amendment search. The Supreme Court has explicitly refrained thus far from ruling on this issue. See, *e. g.,* Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L. Ed.2d 1067 (1968); Cady v. Dombrowski, *supra,* 413 U.S. 433, 442, footnote, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). There have been state decisions finding inventory procedures to be other than "searches" on the theories that there is no intent to "seize" anything or that there is in these situations no "reason" to search or expectation that criminal evidence will be discovered. See People v. Sullivan, 29 N.Y.2d 69, 323 N.Y.S.2d 945, 272 N.E.2d 464. As pointed out in United States v. Lawson, 487 F.2d 468, 472 (8th Cir. 1973), the above decisions are:

. . . based on a highly technical construction of the meaning of "search," unwarranted in our view of the Fourth Amendment. To consider an inventory procedure not to be a "search" does violence to the concept of the Fourth Amendment as a protection of the privacy of the citizenry against unwarranted invasion by government officials.

It is not the intent to seize incriminating evidence which makes governmental intrusions into private effects obnoxious in a free society, but the simple fact of intrusion itself under power of the state.[2] Thus, in Camara v. Municipal

1. This does not mean that such a policy does not present serious line drawing problems. Would it be unreasonable, for example, following an arrest, to go to a suspect's apartment and seize his car parked in front of it, although that car would in many respects be equally as "abandoned." Or would it be reasonable, even were the procedure standard, to go to the arrestee's home, left unguarded in his absence, and place a police guard on it.
   If these practices were prohibited, problems would arise in the determination of how far a vehicle must be from a suspect's home be-

fore it is subject to "protective" seizure. The spectre of a somewhat different problem is raised by the present case: assuming all of the above seizures were justified by precisely the same protective argument as that set out above, would an "inventory" of the contents of such a car or apartment also be justified. While the implications of an inventory of such a car or apartment are not presented by this case, neither are they far off.

2. "In our view the sounder course is to recognize that the Fourth Amendment governs

Court, 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967), the Supreme Court, addressing the issue of administrative searches, wrote:

> We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for fruits and instrumentalities of crime . . . . But we cannot agree that the Fourth Amendment interests at stake in these inspection cases are merely "peripheral." It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.

See also, See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). In a footnote to this passage, the *Camara* court cited the reader to Mr. Justice Brennan's dissent in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). The language of that opinion warrants extended recitation here:

> One more word. We are told that the governmental power to make a warrantless search might be greater where the object of the search is not related to crime but to some other "civil" proceeding—such as matter bearing on the issue whether a man should forcibly be sent from the country. The distinction is rather hollow here, where the proofs that turn up are in fact given in evidence in a criminal prosecution. And the distinction, again, invites a trial of the officers' purposes. But in any event, I think it perverts the Amendment to make this distinction. The Amendment states its own purpose, the protection of the privacy of the individual and of his property against the incursions of officials: the "right of

the people to be secure in their persons, houses, papers, and effects." See Boyd v. United States, 116 U.S. 616, 627 [6 S.Ct. 524, 530, 538, 29 L. Ed. 746]. Like most of the Bill of Rights it was not designed to be a shelter for criminals, but a basic protection for everyone; to be sure, it must be upheld when asserted by criminals, in order that it may be at all effective, but it "reaches all alike, whether accused of crime or not." Weeks v. United States, *supra*, 232 U. S. [383], at 392, [34 S.Ct. 341, at page 344, 58 L.Ed. 652]. It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the "intent" of the invading officers. It is true that the greatest and most effective preventive against unlawful searches that has been devised is the exclusion of their fruits from criminal evidence, see Weeks v. United States, *supra*; Boyd v. United States, *supra*; but it is strange reasoning to infer from this that the central thrust of the guarantee is to protect against a search for such evidence. The argument that it is seems no more convincing to me now than when it was made by the Court in Frank v. Maryland, 359 U.S. 360 [79 S.Ct. 804, 3 L.Ed.2d 877]. To be sure, the Court in Boyd v. United States, *supra*, and in subsequent cases has commented upon the intimate relationship between the privilege against unlawful searches and seizures and that against self-incrimination. This has been said to be erroneous history; if it was, it was even less than a harmless error; it was part of the process through which the Fourth Amendment, by means of the exclusionary rule, has become more than a dead letter in the federal courts. Certainly this putative relationship between the guarantees is not

all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of the exigencies of the case, a central element in the analysis of reasonableness . . .

"This seems preferable to an approach which attributes too much significance to an overly technical definition of 'search.' . . . "
Terry v. Ohio, 392 U.S. 1, 18, n. 15, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968).

to be used as a basis of a stinting construction of either—it was the *Boyd* case itself which set what might have been hoped to be the spirit of later construction of these Amendments by declaring that the start of abuse can "only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed." 116 U.S. at page 635 [6 S.Ct. 524 at page 535].

362 U.S. at 254–256, 80 S.Ct. at 705.[3]

More recently, in Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), the Court again dealt with the question of what constitutes a Fourth Amendment "search" outside of the context of direct criminal investigation. There the visit of a social worker to a welfare recipient's home, refusal to allow which would result in the denial or termination of welfare payments, was considered not to constitute a search.[4] In his brief resolution of this issue, Mr. Justice Blackmun, writing for the Court, first notes:

> It is true that the governing statute and regulations appear to make mandatory the initial home visit and the subsequent periodic "contacts" (which may include home visits) for the inception and continuance of aid. It is also true that the caseworker's posture in the home visit is perhaps, in a sense, both rehabilitative and investigative. But this latter aspect, we think, is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context.

400 U.S. at 317, 91 S.Ct. at 386. The fact that a general inspection is considered somewhat less intrusive than an investigative criminal search was clear in

*Camara, supra.* To what extent Justice Blackmun is saying more here is unclear. From the remainder of the discussion, however, it appears that his ultimate decision is grounded not as much in the relative abrasiveness of the intrusion as in the circumstances under which any actual entry in the class of case with which he was concerned would occur:

> We note too that the visitation itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and *there is no search.*

400 U.S. at 317–318, 91 S.Ct. at 386 (emphasis added). If such an inspection is not a search, it appears to be because any intrusion which is made is not compelled.[5] Any other reading of this language would result in the conclusion that forced admission of government personnel into all private homes for the purpose of "merely inventorying" private property or performing some other administrative or noncriminal investigative function would not constitute an intrusion against which the Fourth Amendment protected. Were the Supreme Court to take such a step, this Court is convinced that such implications would be addressed directly. In the present case, of course, no opportunity to refuse the inventory and suffer the consequences was offered. The element of compulsion is undisputed.

Thus the Court concludes that the "noninvestigative" police "inventory" is a type of official intrusion into private property and effects which the Fourth Amendment was intended to con-

---

3. Frank v. Maryland, to which Justice Brennan refers, was in fact overruled in *Camara, supra.*

4. The Court, however, goes on at length to show that even if it were to be considered a search, it would be allowed under the rea-

sonableness standard of the Fourth Amendment.

5. The Court's later discussion in which a search is assumed is prompted in part "because the average beneficiary might feel she is in no position to refuse consent to the visit." 400 U.S. at 318, 91 S.Ct. at 386.

trol. United States v. Lawson, 487 F.2d 468 (8th Cir. 1973). The framers of the Fourth Amendment sought not to protect criminals, but to protect from unreasonable search those in whose possession no incriminating evidence would be found. And it must be felt that the motivation behind the Amendment was not simply a sympathy with the disappointment of the person searched at the discovery that he was not above suspicion, but a shared indignation at the uncontrolled official sifting and rummaging through private papers and effects which are no less part and parcel of an "inventory" than of a fruitless criminal search.

The question now becomes whether the search conducted in this case was reasonable. There is no contention that probable cause existed for the search. The argument of the Commonwealth is in fact just the opposite. It asserts the police had absolutely no reason to believe that incriminating evidence would be discovered. The inventory was conducted as a matter of standard police procedure for the purpose of ascertaining to the satisfaction of everyone involved exactly what items had been seized so that those items could be returned upon petitioner's release.

The analysis of reasonableness must begin with the Supreme Court's statement in Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970)[5a] that "for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." This conclusion, however, is not reached *a priori*, but arises from the application of specific policy determinations.

> The constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter as well as from the fact that the extensive, and often

noncriminal contact with automobiles that will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband. Cady v. Dombrowski, *supra*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The weakened standard of review applied in car cases, which extends only to dispensing with the presumption that the absence of a warrant makes a search unreasonable, see Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), extends only as far as the above justifications will carry it. "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." Coolidge v. New Hampshire, 403 U.S. 443, 461–462, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971).

The respondent concedes not only that the police did not secure a warrant but that they could not have secured one. There was nothing exigent about the circumstances and there was no cause to believe anything would be found. Thus the exceptions founded upon the ambulatory nature of automobiles and the necessity of an on the spot search are here inapplicable.

The foundation of the "plain view" exception is the propriety of the officer being where he was and doing what he was doing at the time the evidence discovered came into view. Included in the calculus of this decision must be whether the police function being performed itself infringed upon the safeguards provided by the Fourth Amendment even though the seizure of evidence in plain view would, if isolated, be constitutionally unexceptionable.

In Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), petitioner was arrested for robbery and his car, which had been identified leaving the scene of the crime, was impounded as evidence. A regulation of the District of Columbia Police Depart-

---

5a. In *Chambers*, the search was upheld because supported by probable cause on the part of the officers to believe the automobile contained evidence in connection with criminal activity.

ment required that an impounded vehicle be searched and that all valuables be removed. Having completed the search, an officer opened the front door of the car for the sole purpose of closing the windows and locking the doors. At that time he noted the disputed evidence lying face up on the metal door stripping.

The Supreme Court found the question presented to it to involve the isolated acts of rolling up the windows and locking the doors.

> The admissibility of evidence found as a result of a search under the police regulation is not presented by this case. The precise and detailed findings of the District Court, accepted by the Court of Appeals, were to the effect that the discovery of the card was not the result of a search of the car, but of a measure taken to protect the car while it was in police custody. Nothing in the Fourth Amendment requires the police to obtain a warrant in these narrow circumstances.

390 U.S. at 236, 88 S.Ct. at 993. In essence, while refusing to address the full scale search which had been conducted, the Court found that the minimal protective measures of rolling up windows and locking doors of cars legally in custody did not amount to a search. Since this police conduct was not proscribed

and the evidence came in plain view at that time, the evidence was admissible.[6]

Another line of cases, of which *Cady, supra,* is the culmination, indicates that, under certain circumstances, the mere fact of legitimate police custody of a vehicle is sufficient to dispense with a warrant. There is nothing in these decisions, however, to indicate that the requirement of reasonableness, in its Fourth Amendment sense, is in any way mitigated. See Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (probable cause to search the car for evidence held sufficient). Thus these cases rely heavily upon the specific factual circumstances in which they arise. As stated in Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967):

> While it is true, as the lower court said, that "lawful custody of an automobile does not of itself dispense with constitutional requirements of searches thereafter made of it", . . . the reason for and nature of the custody may constitutionally justify the search.

386 U.S. at 61, 87 S.Ct. at 790. The circumstances in *Cooper, supra,* which led the Court to find a search reasonable were explicitly set out:

> Here the officers seized petitioner's car because they were required to do

**6.** Despite the express assertion by the Supreme Court in *Harris* that its holding implied nothing concerning evidence seized in the course of a full search of a car conducted as a matter of police procedure, its holding has been taken by some courts to constitute tacit assent to inventory searches. Thus, in a brief per curiam opinion, citing only *Harris* on the issue, the Court in Barker v. Johnson, 484 F.2d 941 (6th Cir. 1973) found that when policemen, who had gone to appellant's car to "inventory the valuables, to roll up the windows and to lock" it, opened the door and came within plain view of evidence, its discovery was not the result of an illegal search. The presumption made with rather blithe assurance by the *Barker* court, that the locking of a car's doors and the rolling up of its windows are to be equated in Fourth Amendment terms with a full scale inventory, not only does not

arise from *Harris,* but the absence of any such necessary equation was there specifically pointed out. It is simply not obvious that the personal interest sacrificed in conceding to police the freedom to lock a car's doors for the owner's protection is the same as that sacrificed in granting police freedom to sift through the papers and effects in a locked glove compartment or trunk. See, *supra,* at pp. 693–695 and preceding analysis. The necessary articulation of the rebalancing of interests required if *Barker* is to be read as approving inventory searches is simply lacking. However, the result in *Barker* is proper if the focus in that case is shifted, as was the focus in *Harris,* away from the "inventory" and toward the fact that the police had every right to open the door, for the purpose of closing the windows. Evidence then in plain view is, of course, admissible.

so by state law. They seized it because of the crime for which they arrested petitioner. [transporting heroin]. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car—whether the State had "legal title" to it or not—was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it. 386 U.S. at 61–62, 87 S.Ct. at 791.

The facts in the present case not only bear no functional similarity to those in *Cooper,* but are extremely similar to those of Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) which are held up by the *Cooper* Court as a foil to its own situation:

> Preston was arrested for vagrancy. An arresting officer took his car to the station rather than just leaving it on the street. It was not suggested that this was done other than for Preston's convenience or that the police had any right to impound the car and keep it from Preston or whomever he might send for it. The fact that the police had custody of Preston's car was totally unrelated to the vagrancy charge for which they arrested him. So was their subsequent search of the car. This case is not *Preston,* nor is it controlled by it. 386 U.S. at 61, 87 S.Ct. at 791.

In *Cady, supra,* the reasons justifying search again arose from peculiar facts. Following an accident, the automobile of a Chicago policeman was taken into custody by Wisconsin police. As a matter of standard procedure of the department, Wisconsin officers searched the car for the driver's service revolver which they believed he was required to have with him at all times. The Supreme Court held that where "the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals," a search was not unreasonable. The officers in *Cady* responded to a department policy "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." The compelling nature both of this objective and of the desire to carry it out with some immediacy can be readily appreciated.[7] There is no similar importunity involved in the making of an inventory list which might be of some use in resolving a possible future disagreement between police and a prisoner concerning whether police returned everything in his car at the time it was taken into custody. To validate the latter on the basis of the former is to say that if compelling reasons can tilt the balance in favor of a search then any reason can do so. When the safeguards from unjustified official intrusion set out in the Fourth Amendment stand on the other side of that balance, such logic must be brushed aside. The *Cady* line of precedent does not command that the search conducted in the present case be upheld. On the contrary, the proper analysis of the balancing of the interests presented in this case was set out in United States v. Lawson, 487 F.2d 468, 475–476 (8th Cir. 1973). Since the question there raised was precisely the same as that here and the analysis particularly cogent, a considerable segment is set out below.

> The reasoning of the cases upholding inventory searches has been, except where not calling the procedure a constitutionally repugnant is surely no less offensive if carried out universally and methodically as an element of "standard procedure."

---

7. While some weight is given in *Cady* to the fact that the procedure there used was "standard," this would seem to go to the issue of abuse of a facially valid search and not to validity itself. A search which is

search, that the police procedure is a reasonable one to protect the valuable property of an accused while in custody and to protect the police departments from groundless claims for "lost" property. The soundness of this conclusion has been questioned.

Moreover, such a conclusion does not seem adequate to justify the substantial invasion of Fourth Amendment protections involved here. The essential test of the validity of a search is reasonableness, yet the standard of reasonableness must be evolved in light of the Fourth Amendment, not in light of what our view of reasonable police procedures might be. In addressing itself to a contention that it was reasonable to search an entire house without a warrant when a suspect is arrested in the house, the Supreme Court said in Chimel v. California, 395 U.S. 752, 764–765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969):

> But that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would reach the evaporation point.

We think this is a persuasive refutation of the Government's argument that because it is a "reasonable" police procedure it should be upheld under the Fourth Amendment. Obviously the police have an interest in safeguarding themselves against groundless claims. Just as obviously, and more importantly in terms of the Fourth Amendment, owners and operators of motor vehicles have an interest in safeguarding their possessions from unreasonable police intrusions. A rule that upon a showing of a legitimate governmental interest, the constitutional protections of citizens must give way, would eliminate those protections in the very situations for which they were intended. For the police practice considered here to be found reasonable under the Fourth Amendment, absent a warrant or falling within a recognized exception to the warrant requirement, there must be a minimal interference with the individual's protected rights. A police duty to safeguard the owner's property does not automatically give the police the right to search.

> "[L]awful custody of an automobile does not of itself dispense with constitutional requirements of searches thereafter made of it," \* \* \* the reason for and the nature of the custody may constitutionally justify the search.

Cooper v. California, supra at 61 of 386 U.S., at 791 of 87 S.Ct.

It is unnecessary for us to determine all the reasons for, and natures of police custody that might justify a search; here the only justification for the search is bare police custody of the vehicle. While police custody may justify reasonable measures to protect the vehicle itself (i. e., rolling up the windows and locking the doors), or property within plain view in the automobile, such reasonable protective measures do not extend to breaking into a locked trunk. We find ourselves in agreement with the position taken by the California Supreme Court in addressing the contention that the inventory procedures are necessary and reasonable:

> This contention is rebutted by recognition of the vehicle owner's countervailing interest in maintaining the privacy of his personal effects and preventing anyone, including the police, from searching suitcases, and other closed containers and areas in his automobile at the time the police lawfully remove it to storage. In weighing the necessity of the inventory search as protection of the owner's property against

the owner's rights under the Fourth Amendment, we observe that items of value left in an automobile to be stored by the police may be adequately protected merely by rolling up the windows, locking the vehicle doors and returning the keys to the owner. The owner himself, if required to leave his car temporarily, could do no more to protect his property.

Mozzetti v. Superior Court [4 Cal.3d 699] 94 Cal.Rptr. [412] at 417, 484 P. 2d [84] at 89; *accord* Boulet v. State, [17 Ariz.App. 64] 495 P.2d [504] at 509.

It is not as obvious to us, as it appears to be to some courts, why the inventory procedure offers the police any more protection against false claims than would a standard policy of locking the car and returning the keys to the owner; or of allowing the owner to make arrangements himself for the removal and storage of his vehicle.

One further point remains to be added. To the extent that the inventory is conducted for the benefit of the owner of the vehicle, it is unclear why he cannot be asked if he wants the benefit of such protection. To the extent that the inventory is conducted to protect the police against false claims, it must be remembered that the burden of showing that any item was in fact in the car at the time of the seizure would be on the owner. Furthermore, police are required only to take reasonable precautions in light of what they reasonably believe to be in their possession. Upon a refusal to consent to an inventory, it would appear that police would be justified in assuming that they were in possession of nothing more than an automobile and its necessary accoutrements. The dangers of false claims prevailing under these circumstances, while not nonexistent, are sufficiently minute to make the sacrifice of constitutionally protected interests for the purpose of

further diminishing those dangers patently unreasonable. A further possible police protection would entail no more than the sealing of the trunk in such a way that an unbroken seal would indicate that the trunk had not been opened during police custody.

The Court feels it appropriate to address the implications of United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), which was decided after briefs in the instant case were submitted. In that case a person legitimately arrested on a traffic charge was given a thorough search of his person in the course of which several capsules of heroin were discovered. Use of the heroin as evidence was upheld by the Supreme Court since the heroin was discovered in the course of a legitimate search incident to a lawful arrest.

A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

414 U.S. at 235, 94 S.Ct. at 477. However, under the principle of Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), which was reaffirmed in the specific context presented by the case at bar in Cady v. Dombrowski, *supra,* the automobile search in this case cannot stand as a search incident to an arrest. *Cady,* decided only six months before *Robinson* and authorized by the author of the *Robinson* opinion, dealt with *Preston* as follows:

In [*Preston*], the police received a telephone call at 3 a. m. from a caller

who stated that "three suspicious men acting suspiciously" had been in a car in the business district of Newport, Kentucky, for five hours; four policemen investigated and, after receiving evasive explanations and learning that the suspects were unemployed and apparently indigent, arrested the three for vagrancy. The automobile was cursorily searched, then towed to a police station and ultimately to a garage, where it was searched after the three men had been booked. That search revealed two revolvers in the glove compartment; a subsequent search of the trunk resulted in the seizure of various items later admitted in a prosecution for conspiracy to rob a federally insured bank. In that case the respondent attempted to justify the warrantless search and seizure of the trunk and the items therein "as incidental to a lawful arrest." 376 U.S. at 367 [84 S.Ct. 881 at 883]. The Court rejected the asserted "search incident" justification for the warrantless search in the following terms:

> But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. *Ibid.*

It would be possible to interpret *Preston* broadly, and to argue that it stands for the proposition that on those facts there could have been no constitutional justification advanced for the search. But we take the opinion as written, and hold that it stands only for the proposition that the search challenged there could not be justified as one incident to an arrest. 413 U.S. at 444, 93 S.Ct. at 2529. Since the facts in the case at bar for all relevant purposes parallel those in *Preston,* this search cannot be upheld on the "search incident" theory advanced in *Robinson.*

Finally, United States v. Edwards, —— U.S. ——, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Supreme Court's most recent Fourth Amendment pronouncement, is also of no aid to respondent. That case held only that a search otherwise proper under the "incident to a lawful arrest" exception would not be invalidated simply because it was postponed until after arrest or processing, or until the next morning. But far from constituting any vitiation of the command that searches be "reasonable," the decision is expressly grounded in that standard. The search in *Edwards* was for evidence and probable cause existed to believe that the specific evidence sought would be found in the place searched. In the case at bar, it is conceded that there was no reason to believe evidence or contraband was concealed in the trunk. There were no exigent circumstances. There was none of the importunity of a search for weapons. There was no genuine concern on any officer's part that the car or its contents might be physically harmful. In short, there were none of the traditional indices of reasonableness to search. Nor has contemporary society evolved so far from the Founders' jealous concern for personal privacy and security, in person and effects, that a policeman's chance of marginal advantage in the event of what must be considered an unlikely civil action is now reasonable grounds for invasion of those freedoms.

For the reasons heretofore stated, the evidence seized was done so in the course of a search prohibited by the Fourth Amendment and violative of the freedom from unreasonable governmental intrusion which it protects. No reason or precedent has been advanced sufficient to justify infringement upon the Fourth Amendment interests properly embodied in our fundamental law. The evidence so seized should therefore have been suppressed. The writ will issue.