**Larry ROBERTSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 51878.**

Court of Criminal Appeals of Texas.

Oct. 6, 1976.

Louis M. Moore, Houston, for appellant.

Carol S. Vance, Dist. Atty., Clyde F. DeWitt, III, Byron Davis, Asst. Dist. Attys., Houston, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

Larry Robertson was found guilty by the trial court upon stipulated facts for the possession of less than two ounces of marihuana. Punishment was assessed at a fine of $350.00. His sole contention on appeal is that the evidence was illegally obtained as the result of an inventory of his automobile. We overrule that contention and affirm.

When a driver has a collision rendering the car inoperable and he is taken to a hospital because of injuries, is it reasonable for an officer to make an inventory of the property in the car to protect the owner and the officer and the wrecker service?

At approximately 9:00 p. m., Robertson, who was alone in his car, drove into a utility pole on Winkler Drive in Houston. Within a few minutes Officers D. E. Logsdon and R. H. Thomas of the Houston Police Department arrived and found Robertson, who was semi-conscious, ". . . kind of laid across the frontseat." At about the same time, an ambulance arrived. Officer Logsdon helped take Robertson out of the car and put him in the ambulance to be taken to a hospital. The wrecked car was partially in the street. The utility pole was broken and "hot" lines were across the street. Men from Houston Power and Light Company came and moved the lines. The officers then took an inventory of the property in the car. They found, among other things, marihuana in the glove compartment. Officers then directed a wrecker to take the car for storage.

Officer Logsdon testified that an inventory is made when the driver has been taken to a hospital and when the car is not driveable. He related that it was mandatory for him to make such an inventory because he was responsible for the property. This check was to make ". . . sure the man's property is still there when he comes to pick it up" and if anything were stolen or

missing the wrecker driver would be responsible for it. It was stipulated and the record shows that the Houston Police Department required an inventory in such cases. A copy of the inventory was given to the wrecker service and to the accident division office and the auto theft division of the police department. The inventory included in the "Houston Police Department Record of Towed Vehicle" was admitted into evidence.

The policy of making an inventory is based upon logic. Most citizens would expect their property to be protected where officers are responsible for taking charge of a wrecked car and removing it from a street. When officers make such an inventory, they know that there might be valuables which should be protected. A police department should require such an inventory.

■ The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and seizures. In this case there was an inventory and no search as contemplated under the Fourth Amendment. Therefore, there was no unreasonable search. The officers had a duty to protect any property found in the car. They were not looking for evidence to convict Robertson. They had a right to be in the car. A large majority of citizens do not have illegal substances or contraband in their cars and want their property protected. The rights of the law-abiding citizens should be taken into consideration. A special rule should not be made by this Court to prevent such inventories, especially when no constitutional or statutory provision demands it. Inventories made under the circumstances of this case should be commendable, not condemned.

■ The dissent reasons that the car was not in the custody of, and that it was not impounded by, the police. The officers had a duty to take control of the wrecked car which was partially on the street. They took control of the car and this amounted to custody. When they ordered a private wrecking company to take the car for impoundment, it was impounded just as effectively as if it had been taken to a police compound. What difference should it make if the car was taken to a private lot or city compound? The inventory was made before it was moved and when it was under the control of the officers. There is more reason for making an inventory of property in a car which is to be stored on a private lot than there is reason for one stored at a police compound where it is likely to have better police protection. The more property changes hands, the more chances are that it will be lost unless records are kept.

This case is governed by the recent decision of *South Dakota v. Opperman,* —— U.S. ——, 96 S.Ct. 3092, 50 L.Ed.2d —— (1976). There, the Supreme Court of the United States recognizes the authority to conduct routine inventory searches under certain circumstances. The case involved an automobile lawfully impounded by police because of multiple parking violations. Following standard procedures, the police inventoried the contents of the car at the impound lot. Marihuana was discovered in the unopened glove compartment. The arrest and conviction of Opperman for possession of marihuana resulted.

■ In concluding that the police procedure in question was valid, the Supreme Court held that the conduct of the police was not "unreasonable" under the Fourth Amendment of the United States Constitution. The Court reasoned that there is a distinction between automobiles and homes or offices in relation to the Fourth Amendment. This is due to the inherent mobility of automobiles which, of practical necessity, precludes rigorous enforcement of the warrant requirement. *Carroll v. United States,* 267 U.S. 132, 153–154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Coolidge v. New Hampshire,* 403 U.S. 443, 459–460, 91 S.Ct. 2022, 2034, 29 L.Ed.2d 564 (1971). The Court further reasoned that the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. This view rests on the fact that the motor vehicle's function is transportation and it seldom serves as one's residence or as the repository of one's personal ef-

fects. *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974).

The above reasoning points toward and emphasizes the Supreme Court's conclusion in *Opperman.* The decision was based on "community caretaking functions" as follows:

"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' [citation], automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. *To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities.* Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. *The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.*

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody [citation]; *the protection of the police against claims or disputes over lost or stolen property* [citation]; and the protection of the police from potential danger [citation]. *The practice has been viewed as essential to respond to incidents of theft or vandalism. . . ."* (Emphasis supplied) 96 S.Ct. at 3096.

In the instant case, the Houston police were indisputably engaged in caretaking and traffic-control activities. In light of *Opperman,* the Houston police had the authority to seize and remove appellant's vehicle from the street. It is of no material consequence that they selected a private wrecking company to remove the car pursuant to the exercise of that authority. In this connection, *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), relied on by the Supreme Court in *Opperman,* is applicable.

In *Cady,* defendant's vehicle was disabled as the result of an accident. Defendant was intoxicated and later comatose, and therefore could not make arrangements to have the automobile towed and stored. At the direction of the local police the vehicle was towed to a private garage. A warrantless search of the car pursuant to standard police procedures was upheld by the Supreme Court. The sole justification for the search was that it was incident to the caretaking function of the police to protect the community's safety.

Finally, the Supreme Court recognized in *Opperman* that standard inventories often include an examination of the glove compartment, since it is a customary place for documents of ownership and registration, as well as a place for the temporary storage of valuables.

We hold that in following standard police procedures, the conduct of the police was not "unreasonable" under the Fourth Amendment.

No error is shown. The judgment is affirmed.

ROBERTS, Judge (dissenting).

Today the majority has created a new exception to the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Constitution of this State.[1] This exception has been released upon the

---

1. While the majority indicates that what occurred was not a "search" within the meaning of the Fourth Amendment, I feel that a semantical voyage at this point is unnecessary. When a glove compartment of an automobile has been opened and its contents itemized, it has been searched within the meaning of the Fourth Amendment notwithstanding the applicable descriptive terms one may find in Webster to apply to this intrusion into privacy.

Furthermore, the following cases support the proposition that an inventory is a "search" within the meaning of the Fourth Amendment: *U. S. v. Lawson,* 355 F.Supp. 101 (D.C.S.D.),

citizens of this State unsupported by prior case law and without a careful analysis as to when it should or should not be applied. In this sense, the newly created exception differs from the others already in existence. The new exception is justified not by a set of circumstances in existence at the time the search is conducted which logically dictate that it should be applied but rather it is viewed after the fact and given the sanction of law by the single descriptive term: Inventory.

The record reveals that the appellant was involved in a one-car accident at nine o'clock on the evening of the offense. Swerving to avoid two boys on a bicycle, he collided with a telephone pole. His car was rendered inoperable and was lodged partly on and partly off the street.

An ambulance arrived about five minutes later, around the same time that Houston Police Officers D. E. Logsdon and R. H. Thomas arrived to investigate the accident. After giving his name to the officers, the semiconscious appellant was taken by ambulance to a nearby hospital. Appellant was not under arrest or in custody, nor was there any probable cause to believe he had been involved in criminal activity.

Preparatory to having appellant's car towed, the officers conducted an inventory search of the car's contents. They found two pairs of shoes, a water pump, two cases of oil, and a box of papers. In the unopened glove compartment, they also found less than an ounce of marihuana, which formed the basis of this prosecution. Appellant did not consent to the search of his vehicle. There were no "fruits or instrumentalities" of a crime or contraband in plain view in the automobile. The only justification for the search advanced at the trial was that the policy of the Houston Police Department called for inventorying a vehicle prior to its being turned over to a private wrecking company to secure the owner's personal effects and protect the officers from any liability in the event of their disappearance.[2] After the officers completed a list of the property found in the car, it was towed by a private wrecker to a private automobile dealership and placed in a safe enclosure.

There is no contention that the officers conducted the search for their own safety. The appellant did not request that the contents of his automobile be secured in any way, shape or form by the Houston Police Department. The automobile was not subject to forfeiture and, in fact, was in no way seized at all. The only question presented is whether the officers were justified in searching the car for inventory purposes. The only possible basis for this justification is whether the police needed to inventory the car in order to protect themselves from later civil liability.

The majority bases its decision on the recent case of *South Dakota v. Opperman,* —— U.S. ——, 96 S.Ct. 3092, 50 L.Ed.2d

---

aff'd, 487 F.2d 468 (8th Cir.1973); *Cabbler v. Superintendent,* 374 F.Supp. 690 (D.C.Va. 1974); *Boulet v. State,* 109 Ariz. 433, 511 P.2d 168 (1973); *Mozzetti v. Sup. Ct. of Sacramento County,* 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971); *Gagnon v. State,* 212 So.2d 337 (Fla.App.1968).

The mere fact that the police officer conducting the search chooses to call it an inventory does not make his conduct something other than a search. *State v. Jones,* 122 N.J.Super. 585, 301 A.2d 185 (1973).

**2.** Notwithstanding the fact that this was the sole justification advanced at the trial, and should therefore be the isolated issue presented for appellate review, the majority bolsters its opinion by discussing the interest of the citizen in having his property, and not his privacy, protected and by stating, without explaining the basis for, the duty of the police to protect such property and degrade such privacy.

Furthermore, the majority reasons that the police were not looking for evidence and that they should be commended for taking the initiative to invade the appellant's privacy and protect his property. It has been held that regardless of the proffered benevolent purposes and euphemistic explication, an inventory search involves a thorough exploration by the police into private property of an individual, and that the police are not exempt from the constitutional requirements of the Fourth Amendment merely because they are not searching with the express purpose of finding evidence of crime. *Mozzetti v. Sup. Ct. of Sacramento County,* 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971).

—— (1976), in which the Supreme Court of the United States discusses the validity of inventory searches. In that case, the defendant's car had been impounded for multiple parking violations. After the vehicle was towed to the city impound lot, the police, following standard procedures, inventoried the contents of the car. In doing so they discovered marihuana in the glove compartment, for the possession of which the defendant was subsequently arrested. The Supreme Court upheld the validity of the police procedures, stating that such an inventory search was not an "unreasonable" search in violation of the Fourth Amendment. The Supreme Court stated that there is a distinction between automobiles and homes or offices in relation to the Fourth Amendment. This is due to the former's inherent mobility which, of necessity, makes *rigorous enforcement of the warrant requirement impossible. Coolidge v. New Hampshire,* 403 U.S. 443, 459–460, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Furthermore, the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office because the motor vehicle's function is transportation and seldom serves as one's residence or as the repository of personal effects. *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

While the above reasoning by the Supreme Court lends further credence to its disposition of *Opperman,* the basis for its decision lies in the discussion of "community caretaking functions" and the rights and obligations of the police pursuant thereto:

"In the interest of public safety and as a part of what the Court has called 'community caretaking functions,' (citation) automobiles are frequently *taken into police custody.* Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets *at the behest of police* engaged solely in caretaking and traffic control activities. Police will also frequently *remove and impound* automobiles which violate parking·ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to *seize and remove* from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

"When vehicles *are impounded,* local police departments generally follow a routine practice of securing and inventorying the automobile's contents. These procedures developed in response to three distinct needs: The protection of the owner's property while it remains *in police custody,* (citation); the protection of the police against claims or disputes over lost or stolen property, (citation); and the protection of the police from potential danger, (citation). The practice has been viewed as essential to respond to incidents of theft or vandalism." (Emphasis added.)

In the case at bar, the appellant's car was never impounded by the police. Furthermore, the police did not have custody of appellant's car.[3] The stipulated facts reveal that appellant was of the opinion that he was in control of his faculties sufficient

---

**3.** While the majority equates police *control* with police *custody,* they do so unmindful of the fact that this reasoning runs counter to the law of bailment and when carried to its logical extreme, reduces the Fourth Amendment to a bundle of words.

Sometimes police officers, in uniform, guard crowded parking lots at football games, concerts, et cetera. They are assigned these duties in order to prevent vehicles from being burglarized or other crimes from taking place which frequently occur on crowded parking lots at night. While police certainly have control of the vehicles in the sense that they could order

one towed away if it was haphazardly parked and blocking traffic or otherwise creating a hazard, they do not have custody because temporary possession has not been given, either expressly or impliedly, by the owners to the officers. In such situations, if the mere presence of "control" justifies inventory searches to protect the police from civil liability, then they should be given the right to inventory every car on the parking lot, under the reasoning adopted by the majority today, since the owners could later claim that the police, while guarding the lot, took something out of the cars.

to have maintained control and custody of the vehicle; that as far as he was concerned, he never discontinued to exercise custody and control over his vehicle; and that he could have made arrangements to have the vehicle towed and stored but he was not given a chance to instruct anybody what to do with the vehicle or where to send it. Appellant, based on his experience of having worked at a salvage and storage place, stated that he was aware that when an accident occurred in the City of Houston, there are usually one or two wreckers that arrive at the scene and that one of the wreckers picks the car up and puts it in a guarded lot where there isn't any danger of theft. Based on this prior experience and knowledge, appellant stated that he was not concerned about the safety of the contents of his car at the time, that he did not tell the officers to take charge of the vehicle, that all doors of the vehicle had locks and could have been locked if someone wanted to lock them.

At the motion to suppress, the police officer testified that appellant was taken to the hospital approximately three to five minutes after the officers arrived at the accident, and that a wrecker arrived and towed the car away approximately ten minutes after appellant left for the hospital.

In light of the factual distinction present in the case at bar, *South Dakota v. Opperman* is inapplicable, as is *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), relied on by the Supreme Court in *Opperman.* In *Cady,* the police had reasonable grounds to believe a weapon might be in the car, and thus available to vandals. 413 U.S., at 436, 93 S.Ct. 2523. In the case at bar, the State has stipulated that "the station wagon was not searched because the officers believed or had reason to believe that the vehicle contained a dangerous instrument."

A recent Florida decision, decided after *Opperman,* puts the question of inventory search in the proper perspective. In *Alt-*

*man v. State,* 335 So.2d 626 (Fla.App.1976), the defendant lost control of his automobile as a result of an accident following a high-speed chase by the police. After the arrest, two officers conducted an inventory search of the defendant's car and found in excess of five grams of marihuana in the glove compartment. No search warrant was obtained and no claim was made that the defendant consented to the search. Nor was any contention made that the officers had probable cause to believe the defendant had contraband in the vehicle. Defendant's motion to suppress was overruled.

In reversing the trial court, the Florida Appellate Court held that in considering the validity *vel non* of an inventory search, it becomes essential to initially determine whether it is necessary for the police to conduct a search. They went on to state that a common pattern running through the cases they have reviewed is that the police must act in good faith and not use the inventory procedure as a subterfuge for a warrantless search of a vehicle. "A prime criterion to determine if the police have taken lawful custody of a motor vehicle is whether or not it is justifiable for the police, acting under routine police procedure, to become bailees of the vehicle." *Id.,* at 629. The court held that since it was stipulated that the defendant desired and had the ability to have his car removed by someone without the intervention of the police, the underlying necessity for police custody did not exist. The Florida Appellate Court then focused on *Opperman:*

"Our comment on the prerequisite of *necessity* for impoundment as the threshold to justify an inventory search is a timely caveat to law enforcement officers particularly in view of the recent opinion of the United States Supreme Court in *South Dakota v. Opperman,* —— U.S. ——, 96 S.Ct. 3092, 50 L.Ed.2d ——, opinion filed July 6, 1976."[4]

I express no opinion as to when police contact with an individual's automobile·

4. For other cases which hold that the essential prerequisite to a valid inventory search is that police must have taken lawful custody of the

vehicle in the first instance and when police custodial care is not necessary, the inventory search is unlawful, *see,* 48 A.L.R.3rd 537, 551.

could possibly subject the police to a later claim for lost or stolen property and thereby justify an inventory search by the police in order to protect themselves from such subsequent claim by the individual.[5]

I would hold that where the vehicle is not impounded by the police, where express custody of the vehicle is not given by the individual to the police, where the police do not assume custody by seizing the vehicle in the absence of the individual while performing "community caretaking functions," and where the police are in proximity to the vehicle for such an extremely short period of time as they were in this case, there is no reason to create an exception to the requirements of the Fourth Amendment of the United States Constitution or Article I, Section 9 of the Constitution of this State. In such instances, if a search is conducted, the police should fulfill the warrant requirement or bring their actions within the carefully defined exceptions to this requirement.

In this case, the search conducted by the police was "unreasonable" within the meaning of the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Constitution of this State.[6] Consequently, the marihuana should not have been admitted into evidence.

I respectfully dissent, and would reverse and remand the judgment of the trial court.

---

5. Even so, I have doubts that such a procedure is necessary, as police derive no benefit from the performance of these caretaking functions, and their conduct is usually for the sole benefit of the owner of the car. "The nature of a particular bailment determines the standard of diligence imposed by law on a bailee in caring for the property entrusted to him and his liability for loss or injury. If the bailment is for the sole benefit of the bailor, the law requires of the bailee only slight diligence, and holds him answerable only for gross negligence." 7 Tex. Jur.2d Rev. Part 2, *Bailment,* Section 24, p. 732 (and cases there cited). I further doubt that inventory procedures would have any effect in a subsequent suit for missing property. *See,* Szwajkowski, "The Aftermath of Cooper v. California," 1968 University of Ill.L.Forum 401, at pages 407, 408; *and* Nelson, "Chimel v. California: A Potential Roadblock to Vehicle Searches," 17 U.C.L.A.L.Rev. 626, at page 642. Locking the doors of the car would not only better protect the police from false claims, but

would also preserve the individual's constitutional rights. *Mozzetti,* supra.

6. In its opinion, the majority commits a graver error by impliedly reasoning that since the conduct of the police is not constitutionally proscribed, it is thereby constitutionally permitted. There was no showing by the State on appeal that this power to "inventory" is given the Houston Police Department by statute or municipal ordinance. The record reflects merely that the "policy" of the Houston Police Department requires that an inventory be made in such circumstances. This reasoning is repugnant to the fundamental principle in a free society that the police have only those powers given to them by statute. To say the police can act without a grant of power from the legislative branch is to say the police can give the power to act to themselves, which is characteristic of a police state.