# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00325-CR

**David Edwin Wiede, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF CALDWELL COUNTY, 22ND JUDICIAL DISTRICT
NO. 97-007, HONORABLE FRED A. MOORE, JUDGE PRESIDING**

## DISSENTING OPINION

This is a probation revocation case. After a hearing on the State's motion to revoke probation, the trial court found that appellant committed the offense of possession of a controlled substance in violation of his probationary conditions, and revoked his probation. Law enforcement officers had discovered methamphetamine near the driver's seat of appellant's car as they investigated appellant's collision with an 18-wheeler truck on a public highway. The question presented is whether the trial court abused its discretion in finding that the officers at the scene of the accident had a legitimate reason to investigate the accident and were performing a community caretaking function when they discovered the methamphetamine. Based on applying the proper standard of review, I would affirm the district court's judgment. Because the majority failed to adhere to the standard of review, I dissent.

I.

At the hearing on the State's motion to revoke, DPS trooper Christopher McGuairt testified that he came upon the accident scene shortly after 7:00 a.m. on April 17, 2002, as he was traveling from Austin to San Marcos with another trooper to conduct a DPS training exercise for new officers. The officers called in the accident and began directing traffic. Roy Tambunga, a teacher with the Austin Independent School District who witnessed the accident, informed the officers that appellant had collided with the back of an 18-wheeler truck that continued on down the highway after the collision. Based on Tambunga's description of the truck, Officer McGuairt caught up with the driver who returned to the scene. Appellant was badly injured with cuts and abrasions, and a lot of blood was on his face and clothing. McGuairt could not discern the full extent of appellant's injuries, but testified that he was concerned about appellant's health and also that he thought appellant might be under the influence of some type of drug.

Tambunga testified at the hearing that, when he arrived at appellant's car immediately after the accident, he reached into the car, turned off the ignition and remained next to appellant's car window, talking to him and asking if he was all right. There, Tambunga observed that despite severe injuries, appellant had the presence to keep looking back at him. Concerned that appellant might light a cigarette, Tambunga leaned in closer to see what appellant was doing. Appellant's hand was cupped around an object, which he then moved with his left hand toward the area between the console and the driver's seat.

McGuairt testified that Tambunga told the officers that he observed appellant "remove something from his pocket and place it near the console area." Tambunga testified that he told the troopers: "You may want to check the seat, because he was messing around with something

2

there." McGuairt observed another officer then reach into the car and remove a plastic baggy from between the seat and the console.[1] Tambunga's unobstructed view of appellant's previous actions was clear enough that when the officer first reached in and "pulled a little square piece of plastic out," which was ripped open and empty, Tambunga told the officer that the object he had observed in appellant's hand was larger. The officer then pulled from the seat a second object—a sandwich-bag sized plastic wrapper containing a powdery substance—that Tambunga confirmed as the object he had seen. Another officer recorded the baggy of white powder on a property inventory form and took photographs of the accident scene as well as the interior and exterior of the vehicle. Officer McGuairt began to fill out the accident report form, "getting information from the vehicle."

II.

At the hearing on the State's motion to revoke probation, the State argued, *inter alia*, that because the officers were legitimately at the accident scene to assist an injured motorist, direct traffic, and investigate an accident, that the community caretaking exception to the warrant requirement applied to the seizure of the drugs from the car. The trial court admitted the evidence and made the following oral findings:

> It's my opinion that this community caretaker—and probably when the officer's got a legitimate reason to be there, he has no reason to suspect criminal activity. But he's at the scene of an accident where someone rear-ended somebody and someone tells him they're concealing something in the console. That's enough to find out what was in the console when the man's taken by ambulance, whether it be community caretaker or whatever.
>
> * * *

---

[1] Although the sequence of events is not entirely clear from the record, it appears that appellant had been removed to an ambulance at the time the officers reached for the object.

3

> What I've done is I've limited it down to the reasons it gets in is because of the community caretaker. And then the officer at the scene, he's got a legitimate reason to be there. And then he has a reason, from a source, to look where the person told him there might be something concealed, whether it be a weapon or whatever. So I limited it to two items.

After hearing additional evidence, including (i) testimony from a former sister-in-law who claimed that she had borrowed the car and that the drugs belonged to her and not appellant, and (ii) appellant's testimony that he left the car unlocked and had also loaned it to his former sister-in-law, the trial court found the State's allegation in its motion to be true and revoked appellant's probation.

## III.

It is important to note what this case is not about. It does not involve a traffic stop or any type of invasive citizen-police encounter with an occupant of a parked or moving automobile. *See*, *e.g.*, *Wyoming v. Houghton*, 526 U.S. 295, 298 (1999); *New York v. Class*, 475 U.S. 106, 108-10 (1986); *United States v. Brigham*, 382 F.3d 500, 504 (5th Cir. 2004). Appellant's case is distinguishable from those in which a citizen is pulled over for a minor traffic violation and then searched under the guise of the community caretaking exception. *See*, *e.g.*, *Corbin v. State*, 85 S.W.3d 272, 274-75 (Tex. Crim. App. 2002). In a much different series of events, appellant was badly injured, was "extracted" from the automobile and was then taken to the hospital. Even with the suspicion that he might be under the influence of some substance, the record reflects that he was not stopped, questioned, arrested, or detained in any manner. Nor does appellant claim that the officers conducted some generalized search, seeking evidence of unspecified crimes. Rather, the evidence is clear that the officers—en route to other duties—stopped solely to come to his aid and

4

perform bona fide public safety functions. And the trial court so found. The only issue on review then is whether it was proper for the trial court to overrule appellant's objections to the admission of the drug evidence found at the scene of the accident and to exercise its discretion in revoking appellant's probation.

Proper appellate review begins with an analysis of the standard of review. The relevant standard bears repetition here. Our standard of review is highly deferential to the trial court's findings of historical facts that the record supports, especially when the trial court's fact findings are based upon an evaluation of credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). We review *de novo* mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003). And we sustain the trial court's ruling admitting the evidence if it is correct on any theory of law that finds support in the record, even if the trial judge gives the wrong reason for the decision. *Id.*; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *Ross*, 32 S.W.3d at 855-56; *see also Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

When a defendant appeals from a probation revocation hearing, the only question for review is whether the trial court abused its discretion in revoking the defendant's probation. *Bradley v. State*, 564 S.W.2d 727, 729 (Tex. Crim. App. 1973). In determining whether an abuse of discretion occurred, we review the evidence adduced at the revocation hearing in the light most favorable to the trial court's order. *Jones v. State*, 589 S.W.2d 419, 421 (Tex. Crim. App. 1996). At a probation revocation hearing, the trial court is the sole trier of fact and determines the credibility of the witnesses. *Ex parte Tarver*, 725 S.W.2d 195, 198 (Tex. Crim. App. 1986). The trial court

5

must find that the State satisfied its burden of showing that "the greater weight of the credible evidence . . . creates a reasonable belief that a condition of probation" was violated, and has "proved every element of the offense by a preponderance of the evidence." *Kulhanek v. State*, 587 S.W.2d 424, 426 (Tex. Crim. App. 1979).

IV.

The Supreme Court first recognized a community caretaking function of law enforcement as an exception to the Fourth Amendment's warrant requirement in *Cady v. Dombrowski*, a case expressly referenced and relied upon by the trial judge here in making his findings. 413 U.S. 433 (1973). In *Cady*—as here—the police were simply responding to a traffic accident. *Id*. at 436. Because the defendant in *Cady* was an off-duty police officer thought to be carrying a service revolver, one of the responding officers looked in the front seat and glove compartment for the revolver at the scene of the accident. Finding no revolver, the police then summoned a tow truck to remove the disabled vehicle. A wrecker arrived and towed the vehicle to a privately owned garage. It was undisputed that the vehicle was no longer in police control after it was towed. The defendant was arrested for drunken driving and, after questioning, taken to a hospital for unspecified injuries sustained in the accident. *Id*. Several hours later, one of the officers drove to the private garage where the vehicle had been towed and searched it more thoroughly for the revolver. Between the two front seats and in the trunk, the officer found evidence of a murder. *Id*. at 437.

Drawing a distinction between dwelling places and motor vehicles, the Court in *Cady* concluded that this type of caretaking search—conducted on a vehicle that was neither in the custody

6

of, nor on the premises of, its owner, and that was relocated by virtue of lawful police action—was not unreasonable simply because the officers had not obtained a warrant. *Id*. at 441. Recognizing that local police officers, as opposed to federal officers, have frequent regulatory contact with automobiles relating to the operation of vehicles themselves, the Court stated:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id*. The Court concluded that the search was constitutionally reasonable and that no warrant was required. *Id.* at 447.

Searches of automobiles have historically been treated as being constitutionally different than searches of private dwellings. Courts have long recognized that the physical characteristics and uses of an automobile result in a lessened expectation of privacy. *See*, *e.g.*, *Houghton*, 526 U.S. at 303; *Class*, 475 U.S. at 113; *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976). Indeed, an automobile exception to the Fourth Amendment's warrant requirement, allowing officers to search vehicles without first obtaining a warrant in limited situations, has long been recognized by the Supreme Court. *See Carroll v. United States*, 267 U.S. 132 (1925). Warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or

office would not. *Opperman*, 428 U.S. at 382; *Cardwell v. Lewis*, 417 U.S. 583, 589 (1974); *Cady*, 413 U.S. at 439-40; *Chambers v. Maroney*, 399 U.S. 42, 48 (1970).

This exception is due to both the inherent mobility of vehicles as well as the reduced expectation of privacy attached to vehicles. *California v. Carney*, 471 U.S. 386, 391-92 (1985). Courts have recognized that the inherent mobility of automobiles creates circumstances of exigency that make enforcement of the warrant requirement impossible. *Opperman,* 428 U.S. at 367; *Carroll,* 267 U.S. at 153-54; *Robertson v. State*, 541 S.W.2d 608, 610 (Tex. Crim. App. 1976). And courts have repeatedly found that the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In *Camara v. Municipal Court* and *See v. City of Seattle*, the Court held that a warrant was required for an administrative agency to conduct health and safety inspections of private dwellings or commercial premises, unless consent was obtained prior to the search. 387 U.S. 523, 534 (1967) (holding that individual interests protected by Fourth Amendment were not outweighed by public purpose search may serve); 387 U.S. 541, 545 (1967). In contrast, this procedure has never been held applicable to automobile inspections for safety purposes.

This reduced expectation of privacy as to automobiles is further diminished by the public nature of automobile travel. In *Cardwell v. Lewis*, the Court observed that:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.

417 U.S. 583, 590 (1974). The Court has also recognized that, "as an everyday occurrence," vehicles are subjected to police stops and examinations to enforce pervasive governmental regulations, *Opperman*, 428 U.S. at 368, and are "exposed to traffic accidents that may render all their contents open to public scrutiny." *Houghton*, 526 U.S. at 303. While searches of one's person, home or business surely constitute "an annoying, frightening, and perhaps humiliating experience," these traumatic consequences are not necessarily associated with vehicle searches. *Terry v. Ohio*, 392 U.S. 1, 24-25 (1968). Recognizing still that drivers do not relinquish the protections afforded by the Fourth Amendment and the right of individuals to be free of unreasonable governmental intrusion, in *Cardwell v. Lewis* the Supreme Court observed that "insofar as the Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone" of the inquiry. 417 U.S. at 591.

It is this touchstone then that prohibits "unreasonable" searches and seizures. There is no ready test for determining reasonableness other than by balancing the need to search against the invasion that the search entails. *Camara*, 387 U.S. at 534-35. The police officer must be able to point to specific and articulable facts that, when taken together with rational inferences from those facts, justify the particular intrusion. *Terry*, 392 U.S. at 21.

V.

Drawing on *Cady* and its progeny, Texas courts have also recognized the existence of the community caretaking function, but emphasized its narrow applicability.[2] After referencing

---

[2] But the "narrow applicability" is not as the majority would confine it. In finding the application of the doctrine "narrow," the court of criminal appeals specifically admonished that only

9

the community caretaking function in *Robertson*, 541 S.W.2d at 611, the Texas Court of Criminal Appeals recognized the community caretaking function of law enforcement as an exception to the Fourth Amendment's warrant requirement in *Wright v. State*, a case remanded to this Court for application of the factors formulated by the higher court's opinion. 7 S.W.3d 148, 153 (Tex. Crim. App. 1999).

In *Wright*, the court of criminal appeals addressed the issue of whether a deputy acted reasonably in stopping a vehicle out of concern for the defendant's welfare, after the officer observed the defendant, a passenger, retch out of an open rear window. *Id*. at 150. In its opinion, the court made clear that the proper inquiry is whether the police officer acted reasonably under the totality of circumstances to render services in performing his duty to "serve and protect." *Id*. at 151. As to whether the police officer acted reasonably, the court set forth four nonexclusive factors: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted—presented a danger to himself or others. *Id*. at 152. The record demonstrates that appellant was seriously injured, located at the scene of an automobile collision, and in need of medical attention. Although medical personnel were present, the officer's search offered independent assistance based on the possibility that appellant's treatment would be affected by his findings. Based on Tambunga's tip, the officer could infer that the information was relevant to the existing circumstances—either the accident investigation or

in the most unusual circumstances would the community caretaking function extend to warrantless searches of "private, fixed property, or stops of persons located thereon." *Wright v. State*, 7 S.W.3d 148, 152 (Tex. Crim. App. 1999).

appellant's medical treatment. Given these facts, the officers' actions were justified under the *Wright* four-factor test.

The *Wright* dissent by Judge Meyers formulated the test as follows:

> Whether or not a given stop is reasonable "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." In measuring the weight of the public interest, the first step involves an inquiry into whether the officer was performing a bona fide community caretaking or public safety function. In other words, a court should examine whether the purpose expressed by the officer for the stop is consistent with his legitimate role as community caretaker. Furthermore, the officer's proffered justification must be supported by "specific and articulable facts."

*Id*. at 155 (Meyers, J., dissenting) (internal citations omitted).

Here, by either test, the trial court had a basis for finding that the State established a bona fide caretaking function. The officers' actions were reasonable and consistent with their legitimate roles as community caretakers. That the officers had a legitimate reason to investigate the accident is undisputed. The Texas Legislature has provided that "[a] peace officer who is notified of a motor vehicle accident resulting in injury [on a highway] . . . may investigate the accident and file justifiable charges relating to the accident." Tex. Transp. Code Ann. § 550.041(a) (West 1999 & Supp. 2004-05).[3] Indeed, Texas peace officers are charged with public safety duties that extend

---

[3] A law enforcement officer who in the regular course of duty investigates a motor vehicle accident is also obligated to submit a written report of the accident. Tex. Transp. Code Ann. § 550.062 (West 1999 & Supp. 2004-05).

beyond crime detection and investigation. *See Wright*, 7 S.W.3d at 154 (Meyers, J., dissenting). The investigation at the scene performs an important and routine administrative purpose.[4]

Here, the justification was supported by specific and articulable facts. As Officer McGuairt testified and the court recognized, the officers wore several hats and performed various functions of local law enforcement officers arriving at the scene of the accident. DPS Trooper Freeman testified that he took photographs and recorded "the names of the people involved in the accident, the directions of travel, matching up the damage to each vehicle, looking at who possibly was at fault at the accident and trying to make a decision." He further testified that they cleared the site so that traffic could get through, that they took custody of the vehicle, and had it inventoried and towed. Officer McGuairt testified that the troopers were working the accident scene until the assigned trooper arrived, and that they were obtaining "pertinent information relating to the accident." And the trial court so found.[5]

Experience unfortunately teaches us that an accident scene on a public highway is often chaotic. Investigators who arrive at the scene shortly thereafter are called upon to make immediate judgment calls. Even as they are monitoring their own safety and that of other motorists,

---

[4] The investigation of an accident scene is akin to that of firemen arriving at the scene of a burning building. *See Michigan v. Tyler*, 436 U.S. 499 (1998). In *Michigan v. Tyler*, in upholding the warrantless entry and re-entry of premises to determine the cause of a fire, the Court recognized that fire officials are charged not only with extinguishing fires, but also with finding their causes. The Court observed: "Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction." *Id*. at 510. The Court then recognized that it was necessary for the officials to remain in the building a "reasonable" time "pursuing their duty both to extinguish the fire and to ascertain its origin." *Id*.

[5] In *Michigan v. Tyler*, the fire chief testified that their job was to respond to the fire and "to determine its cause and make out all reports." *Id*. at 501.

the officers must assess the injuries of those involved, summon emergency vehicles, direct traffic, measure and photograph the scene, determine whether and when vehicles may be safely moved, determine whether to tow and/or impound vehicles, and investigate the cause of the accident. As found by the trial court, the officers here were performing a bona fide caretaker activity. Any incursion was incident to this function. Absent ruse, pretext, or subterfuge on the part of the officers to rummage for evidence for a criminal proceeding, and in light of the findings of the trial court, I would find that the officers acted reasonably.

Moreover, the privacy interest at stake here was minimal because appellant had already been removed from the car and the demolished vehicle was under control of the officers. As in *Cady*, the officers here were responding to a specific and narrowly articulated tip. *See* 413 U.S. at 436. Based on the specificity of the "tip" from Tambunga, the citizen-bystander-witness, it was reasonable for the officer to follow up on the information. That appellant used his unbroken arm to remove an object from his pocket and place it between his seat and the console was information that the officers could not ignore in order to perform their duties. The officer conducted a limited search of the suspected area: He reached into the identified space of appellant's car and retrieved a plastic baggy. After Tambunga stated it was not the correct object, the officer retrieved a larger baggy filled with a powdery substance, later identified as 1.76 grams of methamphetamine. Tambunga confirmed this was the same object he saw appellant attempt to conceal.

What is also clear from the record is that Tambunga thought the information he imparted to the troopers was significant to their task at hand. Whether the object he observed was medicine appellant might need or evidence of a crime, Tambunga thought it was relevant to the

13

officers' performance of their duties. The officers followed up only on the specific, articulated information provided by the bystander witness, and the trial court found their actions to be objectively reasonable. It would not have been reasonable for the officers to ignore the information. The most prudent and constitutionally valid course, under these circumstances, was the one taken.

More recently, in *Laney v. State*, the court of criminal appeals expanded its analysis of the community caretaking function to examine its application to the warrantless entry and search of a private residence. 117 S.W.3d 854. In that case, police officers were investigating a disturbance involving Laney when they noticed two young boys exit his darkened trailer onto the front porch. When Laney acknowledged that the children were not his and the boys re-entered the trailer, one of the officers asked Laney if he had ever been arrested. Laney responded that he had been arrested for indecency with a child. An officer entered the trailer to retrieve the children. At the suppression hearing, the officer testified that because Laney had been detained and was possibly going to jail, it was his responsibility to get the children out of the trailer and find out who their parents were. Once inside the trailer, the officer observed pornographic material involving young boys. He did not touch the materials, but reported the items to detectives who "obtained appellant's consent" to search the trailer. *Id*. at 856.

Applying the emergency doctrine and finding exigent circumstances—but no immediate threat to the children's safety or well-being—the court upheld the warrantless entry. *Id*. at 863. The court found that there was an immediate, objectively reasonable belief on the officer's part that he needed to act to protect the life of one of the children and prevent him from incurring serious injury. *Id*. Importantly, the court also noted that the search was strictly circumscribed by the

14

exigencies that justified the entry. *Id*. Because one of the boys had appeared at the door and told the officer where he could find the second child, the officer proceeded directly to where the first boy told him the second boy could be found; the officer located the child, did not expand the search, and immediately exited the trailer. *Id*. Based on those circumstances, the court found that the emergency doctrine applied. *Id*.

Distinguishing between three types of functions, all identified under the rubric of community caretaking, the *Laney* court recognized the emergency aid doctrine, the automobile impoundment and inventory doctrine, and the community caretaking or public servant doctrine. *Id*. at 860. "The common thread in each of the three exceptions to the warrant and probable cause requirements is the officer's purpose." *Id*. But the court went on to distinguish the emergency doctrine from the "public servant" doctrine. "[W]hile both doctrines are based on an officer's reasonable belief in the need to act pursuant to his or her 'community caretaking functions,' the emergency doctrine is limited to the functions of protecting or preserving life or avoiding serious injury," and primarily "deals with warrantless entries of . . . private residences." *Id*. at 861. The public servant or *Cady* doctrine "deals primarily with warrantless searches and seizures of automobiles (and will be limited to those circumstances except in unusual circumstances). . . ." *Id*.; *see also Wright*, 7 S.W.3d at 152 n.7 (stating that the emergency doctrine is similar to the community caretaking function, except that it applies to residences, rather than vehicles). Thus, the *Cady* rationale, which supported the search of an impounded vehicle for a missing pistol, also supports an officer's legitimate role as a public servant with a duty to assist those in distress and maintain and foster public safety on the public highways. *See* 413 U.S. 433.

15

While the facts in *Cady*, *Wright* and *Laney* differ in significant respects from those at hand, the factors supporting a finding that the officers were engaging in their community caretaking function were all present here: The officers were conducting legitimate caretaking functions, they were assisting a motorist in distress and in immediate need, and the intrusion was minimal and narrowly circumscribed. The caretaking function was their primary motivation. The search was focused in its objective and it was no more intrusive than necessary to fulfill that objective. Certainly, it was less intrusive for the officer to search appellant's front seat than it would have been for him to pat-down the appellant, or to search the area within appellant's immediate control, or to arrest the appellant. It is difficult to imagine a situation with a more minimal privacy interest than here: The vehicle was immobilized, inoperable, under lawful police control and then impounded by a private towing company, and the driver had been injured and removed from the scene by an ambulance. In these circumstances, the State's interest in rendering aid and performing its administrative functions outweighs appellant's eclipsed privacy interests.[6]

The trial court also concluded that the evidence did not support a proper inventory search. I agree. In the absence of a warrant, the State carries the burden of proving that its search

---

[6] "When balancing the competing interests, our determinations of 'reasonableness' under the Fourth Amendment must take account of these practical realities. We think they militate in favor of the needs of law enforcement, and against a personal-privacy interest that is ordinarily weak." *Wyoming v. Houghton*, 526 U.S. 295, 306 (1999). In assessing reasonableness under the Fourth Amendment in a recent traffic-stop case, the Texas Court of Criminal Appeals viewed the totality of the circumstances in the light most favorable to the trial court's factual findings, concluding that it does not require a "single, formulaic approach," "nor does it require rigid adherence to the 'least intrusive means' of investigation defined by Monday-morning reviewing courts." *Kothe v. State*, __ S.W.3d ___ (2004 Tex. Crim. App. LEXIS 1749, Oct. 20, 2004) (quoting *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004)).

16

was constitutionally reasonable under some exception to the warrant requirement; proof that the officers followed standardized procedures in conducting an inventory search of an impounded vehicle, or one under their control, is one way to satisfy this burden. *Opperman*, 428 U.S. at 373. Here, the State did not carry its burden in demonstrating that the officers employed a standardized inventory procedure. The inventory form was unsigned and incomplete, and the officer who was charged with its execution did not testify.

But the impoundment is relevant to our analysis for a separate reason. It is undisputed that appellant's vehicle was lawfully impounded. The manner of impoundment supports the State's argument that the officers were performing a caretaking function. Trooper Freeman testified that they took custody of the vehicle and had it towed to an impound lot, but "we didn't put a hold on the vehicle." That they did not conduct a general search at the scene and that the car was impounded but not searched and was later released to appellant's friend is consistent with the officers' testimony that they merely conducted the accident investigation authorized by statute.

Applying the objective standard of reasonableness in determining whether the search is justified under the *Cady* doctrine, I would find that the trial court did not abuse its discretion in revoking appellant's probation for committing the offense of possession of methamphetamine. I would affirm the judgment of the trial court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Filed: January 21, 2005

Publish

17